IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RALPH DENNIS GORDON,    )
                       )
        Plaintiff,      )
                       )
        v.              )        Case No. 10-0904-W-REL-SSA
                       )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,     )
                       )
        Defendant.      )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Ralph Dennis Gordon seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for Disability Insurance Benefits under Title II of

the Social Security Act (Act), 42 U.S.C. §§ 401, et seq (Tr. 97-103). Section 205(g) of the Act,

42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of

the Social Security Administration under Title II.  Plaintiff argues that the Administrative Law

Judge ("ALJ") erred by (1) failing to give controlling weight to plaintiff's treating psychiatrist,

(2) finding that plaintiff's substance abuse was a contributing factor material to the disability

determination, (3) relying on a hypothetical question posed to the vocational expert that failed

to capture all of plaintiff's impairments, and (4) concluding that plaintiff could perform work

requiring medium exertion. I find that the ALJ did not err in any of these respects and that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.  BACKGROUND

Plaintiff filed his application with the agency on March 30, 2009, and it was denied

(Tr. 9, 52). On January 1, 2010, following an administrative hearing, ALJ George M. Bock

found that plaintiff was not under a "disability" as the Act defines the term (Tr. 9-19). On July 29, 2010, the Appeals Council denied plaintiff's request for review (Tr. 1-3).

The ALJ found that plaintiff had the severe impairments of bipolar disorder; history of alcohol and cocaine abuse; mild degenerative joint disease of the left glenohumeral joint (shoulder) and mild left AC joint arthrosis,[1] with history of left shoulder pain; type II diabetes mellitus; and mild degenerative disc disease of the lumbar spine, but that he did not have any impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, app. 1 (Tr. 18). The ALJ found that plaintiff's subjective complaints of disability were not credible (Tr. 18). The ALJ found that plaintiff could perform work at the medium level of exertion, subject to certain nonexertional limitations (Tr. 18). The ALJ further found that plaintiff's impairments did not preclude him from performing his former work, as well as other work that exists in substantial numbers in the national economy (Tr. 19). Consequently, the ALJ found at both steps four and five of the sequential analysis that plaintiff was not disabled (Tr. 19). Thus, the decision of the ALJ stands as the final action of the Commissioner, and plaintiff has exhausted his administrative remedies.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

---

[1]Disease of the acromioclavicular joint, or AC joint, which is between the collarbone and the shoulder blade.

2

opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Griffon v. Bowen</u>, 856 F.2d 1150, 1153-54 (8th Cir. 1988); <u>McMillian v. Schweiker</u>, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations

are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  THE RECORD

The record includes the testimony of plaintiff, plaintiff's caseworker Brandon Cobb, and vocational expert Stella Doring, in addition to documentary evidence admitted at the hearing.

### A.  ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

#### 1.  APPLICATIONS FOR DISABILITY INSURANCE BENEFITS

On June 30, 2008, and April 10, 2009, plaintiff applied for disability insurance benefits (Tr. 93-103). Plaintiff reported having filed previous applications with the Social Security Administration (Tr. 93, 97). In both applications, plaintiff reported being unable to work due to disability beginning on July 1, 2007 (Tr. 93, 97).

## 2. EARNINGS RECORD

Plaintiff's earnings record shows earnings for the following years in the amounts indicated:

| Year | Earnings |
|------|----------|
| 1970 | $    12.50 |
| 1986 | 915.14 |
| 1991 | 619.25 |
| 1996 | 1,202.25 |
| 1997 | 4,133.02 |
| 1998 | 2,135.74 |
| 2001 | 4,657.20 |
| 2002 | 6,987.70 |
| 2003 | 5,288.76 |
| 2004 | 7,944.03 |
| 2005 | 156.78 |
| 2006 | 4,597.32 |
| 2007 | 10,287.48 |
| 2008 | 1,097.01 |

(Tr. 104.)

All other years show zero earnings.

## 3. DISABILITY REPORT - FIELD OFFICE

In a July 10, 2008, Disability Report plaintiff reported that his alleged onset date was July 1, 2007, but he indicated that he had continued to work through December 1, 2007 (Tr. 123). The report also shows that plaintiff had earlier applied for disability, which was denied on September 24, 1990 (Tr. 124). The field interviewer observed no problem with plaintiff's

hearing, reading, breathing, understanding, coherency, concentration, talking, etc. (Tr. 125). The interviewer observed that plaintiff's behavior, appearance, and grooming all appeared normal (Tr. 125).

### 4. DISABILITY REPORT - ADULT

In an undated Disability Report plaintiff reported his illnesses that limit his ability to work as including: depression, Hepatitis C, and diabetes (Tr. 127). As to how these conditions affect his ability to work, plaintiff stated that he has poor concentration, bad mood swings, constant depression that causes him difficulty in functioning, diabetes, carpal tunnel syndrome, and Hepatitis C. Plaintiff also complained about a neck problem, which continued to bother him and prevented him from lifting more than 50 pounds (Tr. 128). Plaintiff reported that these conditions first interfered with his ability to work in 2006, and made him disabled on July 1, 2007 (Tr. 128). Plaintiff reported that he continued to work after 2006, that he worked no fewer hours, and that he had no change in his job duties (Tr. 128). Plaintiff said that he stopped working when he went to drug rehabilitation (Tr. 128). Plaintiff reported that he completed the 11th grade in 1971, and that he completed culinary-arts training in 2006 (Tr. 132).

### 5. THIRD-PARTY FUNCTION REPORT

On July 29, 2008, plaintiff's wife, Alicia Corinth Gordon, reported knowing plaintiff for three years (Tr. 171). Ms. Gordon reported that she must prompt plaintiff to dress, do any work, and take his medications, and that plaintiff generally spends most of his time sleeping (Tr. 173).

### 6. THIRD-PARTY FUNCTION REPORT

On May 27, 2009, Brandon Cobb, plaintiff's caseworker, filled out a function report on plaintiff (Tr. 217-25). In that report, the caseworker stated that plaintiff lives in a group home, which provides his meals (Tr. 219). The caseworker observed that plaintiff has problems with

personal care because he has limited use of his left hand (Tr. 218). The caseworker also stated that plaintiff's only housekeeping activity is doing his laundry (Tr. 219). The caseworker helps plaintiff with his appointments and getting out into the community (Tr. 220).

## B. SUMMARY OF MEDICAL RECORDS

On December 27, 2006, plaintiff went to Truman Medical Center complaining about sores on his penis and a blood sugar reading of 421 (Tr. 311-12).[2] Plaintiff was asked about substance abuse and denied it (Tr. 311). During the interview, plaintiff was unable to name the medications he was then taking (Tr. 311).

On December 28, 2006, plaintiff went to Truman Medical Center with a blood sugar reading of 400, taken at Truman the day before, and reported that he had been out of medications for two weeks (Tr. 380-81).

On February 2, 2007, plaintiff went to Swope Parkway Health Center with uncontrolled diabetes mellitus (Tr. 378-79). The notes show that plaintiff had to be started back on Actos, which is used to control blood sugar, along with diet and exercise (Tr. 379).

On May 3, 2007, plaintiff went to Truman Medical Center for evaluation of his asthma, diabetes and hypertension (Tr. 395-97). Plaintiff also reported pain in his upper extremities, which had previously been diagnosed as carpal tunnel syndrome but had not been treated (Tr. 395-97). Plaintiff reported smoking less than one pack of cigarettes a day for 40 years, and being a former drug abuser but clean for 18 months (Tr. 395). Plaintiff also reported working as a cook (Tr. 395). Plaintiff was referred to the diabetes clinic, and Singulair[3] was added to his medications (Tr. 395-97).

---

[2]Blood sugar between 70-110 mg/dl before a meal is considered normal. After a meal, blood sugar may rise to between 100-140 mg/dl. Anything over 140 mg/dl is considered symptomatic of diabetics.

[3]Singulair is used to prevent difficulty in breathing.

(July 1, 2007, is plaintiff's alleged onset date.)

On August 11, 2007, plaintiff went to Truman Medical Center with chest pain and lower back pain (Tr. 307-08). During the interview, plaintiff denied substance abuse (Tr. 307).

On September 19, 2007, plaintiff went to Swope Parkway Health Center with uncontrolled diabetes (Tr. 375-76). The notes reflect that plaintiff had been out of medication for two to three months (Tr. 375).

On September 24, 2007, plaintiff went to Swope Parkway Health Center for a physical and complained about his inability to check his blood sugar because he did not have the necessary equipment (a program did not cover the cost) (Tr. 370). He was anxious about his blood sugar and complained about fatigue (Tr. 370). Plaintiff was cautioned about his poor diet and lack of exercise (Tr. 370). The notes also show that plaintiff had used crack cocaine in May (Tr. 370).

On September 25, 2007, plaintiff went to Dr. James True of Swope Parkway Health Center as part of the intake protocol for admission to Imani House (Tr. 248-49). Plaintiff discussed his depression, his lifetime of hearing negative comments, poor self-esteem and feeling trapped. (Tr. 248-49). Plaintiff reported that he had been in and out of jail and that his children have nothing to do with him because he neglected them (Tr. 248). Dr. True diagnosed a Major Depressive Disorder, recurrent, severe, and alcohol and cocaine dependence (Tr. 248-49). Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 60.[4]

On September 26, 2007, plaintiff was evaluated by Ronald Hughes on behalf of the Department of Mental Health for placement at Imani House, a rehabilitation facility (Tr. 247).

---

[4]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Plaintiff was noted to be isolated from his family (Tr. 247). Between the ages of eight and thirteen, plaintiff was placed at an industrial home and, later, was in prison (Tr. 247). Plaintiff reported one previous psychiatric hospitalization and one inpatient stay for drug rehabilitation (Tr. 247). Plaintiff was diagnosed with depression and was prescribed Wellbutrin[5] and Trazodone[6] (Tr. 247). Plaintiff was found eligible to receive residential addiction services (Tr. 247).

On December 28, 2007, plaintiff went to Swope Parkway Health Center and was found to be positive for Hepatitis C (Tr. 368-69).

On January 7, 2008, plaintiff went to Dr. True at Swope Parkway Health Center complaining of depression and anxiety, although Dr. True wrote that plaintiff did not look anxious (Tr. 340). Dr. True gave a provisional diagnosis of bipolar disorder and anxiety disorder (Tr. 340).[7] Dr. True assigned plaintiff a GAF score of 45[8] and prescribed Trileptal, an anti-seizure medication.

On February 15, 2008, plaintiff went to Swope Parkway Health Center for evaluation of his diabetes, hypertension, and insomnia (Tr. 365-66). The notes reflect that plaintiff had no complaints about anything except needing medication refills (Tr. 365). Plaintiff was told to stop smoking and using drugs and to increase his walking (Tr. 366). Plaintiff was instructed to decrease his intake of sweets and instructed about dietary approaches to stop hypertension (DASH) (Tr. 366).

---

[5]Wellbutrin is used to treat depression.

[6]Trazodone is used to treat depression.

[7]296.60 is the code for Bipolar I Disorder; 300.00 is the code for anxiety disorders.

[8]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On March 10, 2008, plaintiff went to Swope Parkway Health Center with increased foot pain (Tr. 362-63). Plaintiff's blood work revealed an increased A1C[9], despite plaintiff's claim of diabetic-medication compliance, and Hepatitis C with a high viral load (Tr. 363). Plaintiff claimed to be sober, and he was referred to a GI clinic for possible treatment of his Hepatitis C (Tr. 363).

On April 23, 2008, plaintiff went to Swope Parkway Health Center for a mental health evaluation (Tr. 349-59). He described his past symptoms of anxiety, impulsiveness, restlessness, and lack of concentration (Tr. 349-59). Plaintiff reported that because of behavioral and emotional problems, he was sent to a boy's home at the age of eight (Tr. 349). Plaintiff also reported an extensive legal history and disclosed that he had spent most of his adult life incarcerated (Tr. 349). Plaintiff expressed frustration with his inability to work at his trade as a cook because of his felony convictions (Tr. 349).

Plaintiff was rated as having moderately severe anxiety and depression, moderate suicidality, guilt feelings, and hostility (Tr. 356). Plaintiff was experiencing irritability, sleep disturbance, feelings of sadness and hopelessness, racing thoughts, restlessness, and anxiety (Tr. 357). Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe, and Anxiety Disorder, not otherwise specified (Tr. 358). Plaintiff was assigned a GAF score of 43[10] (Tr. 358).

On April 23, 2008, plaintiff went to Dr. True at Swope Parkway Health Center with depression and anxiety (Tr. 347-48). Plaintiff reported that all of his life he felt picked on and put down (Tr. 347). Plaintiff used to use crack cocaine and spent most of his life in jail for

---

[9]A1C is a test to show how a patient's blood sugar is being controlled over a period of time, such as over two to three months.

[10]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

murder (Tr. 347). His sleep was poor to non-existent (Tr. 347). Plaintiff was not psychotic (Tr. 347). Dr. True diagnosed dysthymia[11] and cocaine dependence and assigned him a GAF score of 45[12] (Tr. 348).

On May 5, 2008, plaintiff went to Dr. True at Swope Parkway Health Center with no psychosis, but with mild anxiety and mild depression related to his marriage (Tr. 346). Plaintiff was trying to salvage his relationship with his wife and was convinced that Viagra[13] would help (Tr. 346). Plaintiff was assigned a GAF score of 48[14] (Tr. 346).

On May 7, 2008, plaintiff went to Truman Medical Center complaining about intermittent epistaxis (nose bleed) (Tr. 309-10). At intake, plaintiff was asked about drug abuse, and he denied it (Tr. 309).

On June 26, 2008, plaintiff went to Janae Harris, MSW, at Swope Parkway Health Center for his first therapy appointment (Tr. 345). Plaintiff reported looking for work but having problems because of his previous incarceration (Tr. 345). Plaintiff was struggling with his marriage and was trying to control his diabetes (Tr. 345). Several weeks prior, plaintiff went to the hospital because he felt suicidal (Tr. 345). Plaintiff was diagnosed with a Major Depressive Disorder, recurrent, severe and an anxiety disorder, not otherwise specified (Tr. 345).

---

[11]Dysthymia is depression characterized by low mood. It is not as severe as major depression.

[12]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[13]Viagra is used to treat erectile dysfunction.

[14]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On July 17, 2008, plaintiff went to Dr. True at Swope Parkway Health Center with increased depression (Tr. 345). Plaintiff believed that the source of his depression was erectile dysfunction and if that could be cured, he would be alright (Tr. 345).

On August 1, 2008, plaintiff went to Dr. True at Swope Parkway Health Center feeling defeated and stuck; he had no job and no money; he was experiencing his old addiction problems; and was being called a loser (Tr. 342). Plaintiff had no psychosis and no suicidal ideation; he appeared anxious with a depressed mood and affect. (Tr. 342). Dr. True added Ativan[15] to plaintiff's medications (Tr. 342). Plaintiff was diagnosed with a Major Depressive Disorder, recurrent, severe and was assigned a GAF score of 40[16] (Tr. 342).

On September 29, 2008, plaintiff went to Dr. True at Swope Parkway Health Center (Tr. 339, 341). Plaintiff reported that his marriage was bad and his family did not want him around for the holidays because of his Hepatitis C, which they feared would be contracted by their children (Tr. 339, 341). Plaintiff was feeling suicidal but had no plans and stated that he would not act on it (Tr. 339). Dr. True recorded that plaintiff did not appear suicidal (Tr. 339). Plaintiff said that he could no longer obtain his blood pressure medication because Outreach was no longer paying for it (Tr. 339). Dr. True observed that plaintiff was mildly distraught, anxious and depressed; plaintiff was not suicidal; there was no psychotic material; and plaintiff's insight was fair (Tr. 339). Dr. True prescribed Trazodone,[17] Valium,[18] and

---

[15]Ativan is used to treat anxiety.

[16]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[17]Trazodone is used to treat depression.

[18]Valium is used to treat anxiety.

Clonidine[19] for his symptoms and assigned him a GAF score of 50[20] (Tr. 341).

On January 15, 2009, plaintiff was admitted as an inpatient at Truman Medical Center with hyperglycemia and chest pain (Tr. 273-93). On arrival plaintiff's blood sugar was 538 (Tr. 273). In addition, plaintiff reported a two- to three-month history of chest pain that first began after using large amounts of cocaine and alcohol, but that had continued waxing and waning every day (Tr. 275). Accompanying his chest pain, plaintiff reported shortness of breath (Tr. 273, 275). Plaintiff's chest pain was deemed non-cardiac and plaintiff admitted to using cocaine the day prior to his admission (Tr. 273-77). On administration of Lantus and Humalog, plaintiff's blood sugars declined from 500s to the 200s (Tr. 273). Plaintiff's diabetic medications were adjusted and he was scheduled to enter a substance abuse program at Imani House upon release from the hospital (Tr. 273-84). On January 17, 2009, plaintiff was discharged from the hospital "ambulating well, and [without] abdominal pain. No chest pain throughout hospital admission, and blood sugars had decreased and were in better control, and he was deemed ready for discharge" (Tr. 273).

On February 6, 2009, plaintiff went to Swope Parkway Health Center for treatment of his diabetes and hypertension (Tr. 333). Plaintiff's blood sugars were running in the 300 range despite using Humalog[21] and Lantus[22] (Tr. 333). Plaintiff's doctor believed that he needed additional diabetic education to learn to control his blood sugar (Tr. 333).

---

[19]Clonidine is used to treat high blood pressure.

[20]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[21]Humalog is an insulin injection to control blood sugar.

[22]Lantus is an insulin injection used to control diabetes.

On February 18, 2009, plaintiff went to Swope Parkway Health Center for follow-up on his diabetes (Tr. 329). Plaintiff was living at a substance abuse rehabilitation facility, Imani House (Tr. 329). Plaintiff was carbohydrate counting and was getting his blood sugars checked regularly by staff at Imani House (Tr. 329). Plaintiff's blood sugars continued to run high; therefore, his insulin was increased (Tr. 329).

On March 27, 2009, plaintiff went to Truman Medical Center with left hip pain and neck pain (Tr. 294-306). X-rays of the left knee and pelvis were negative for any injury; however, an x-ray of the lumbar spine revealed anterior wedging of T12 and mild to moderate facet arthrosis At L4-5 and L5-S1 (Tr. 305). During intake, plaintiff was asked about substance abuse and denied it (Tr. 297).

On May 5, 2009, plaintiff, then age 56, was evaluated by the State of Missouri Department of Mental Health to assess his need for a case manager and other community services (Tr. 317-21). Plaintiff was noted to be living at Thompson Care Center and needed additional assistance to follow up with appointments, find housing, and remain medication compliant (Tr. 318). Plaintiff reported his criminal history as including plaintiff's then-current status as a probationer for writing a bad check, his imprisonment as a child, a burglary conviction that resulted in a three-year sentence, and a murder conviction (Tr. 318). Plaintiff reported that he had a history of drug abuse including cocaine, heroin, and alcohol (Tr. 319). Plaintiff reported having three children but having no contact with any of them (Tr. 320). Plaintiff reported his current physical health problems included high blood pressure, diabetes, asthma, Hepatitis C, arthritis in his lumbar spine, pain in his left hand, memory loss and impotence (Tr. 318).

Emotionally, plaintiff had been diagnosed with a Bipolar Disorder with symptoms including mood swings, depressed mood, crying spells, isolation, anger control problems, anxiety, forgetfulness, and sleep disturbance (Tr. 319). Plaintiff's GAF score was estimated to

be 36[23] (Tr. 319). Plaintiff was found eligible to receive case management services (Tr. 321).

On May 6, 2009, plaintiff went to Truman Medical Center with left shoulder pain and difficulty raising his left arm above his head (Tr. 393). In addition, plaintiff reported pain in his neck, pain and weakness in his legs, and dizziness (Tr. 393). Plaintiff had a long list of medications but was unsure about which he was taking and which he was not taking (Tr. 393). The notes reflect that plaintiff had a history of taking alcohol every day but here plaintiff denied ever using alcohol; that plaintiff smoked one-half pack of cigarettes per day, a habit he had followed for 20 years; and that he had a history of using cocaine and crack but was clean at the time (Tr. 393). Plaintiff's doctor noted that he walked with shuffling steps and lost his balance after a few seconds standing on his tiptoes or heels (Tr. 394). In addition, plaintiff's mental activity was slow with a strange flat affect and difficulty understanding basic questions (Tr. 394). Additional testing was recommended for his shoulder pain, as well as complete blood work to assess the status of his diabetes and Hepatitis C (Tr. 394).

On May 21, 2009, plaintiff went to see Dr. True at Swope Parkway Health Center (Tr. 433). Dr. True observed that plaintiff's mood had improved and he was less depressed (Tr. 433). Plaintiff's medication was decreased and he was assigned a GAF score of 50[24] (Tr. 433).

That same day plaintiff underwent an arterial doppler study of his lower extremities (Tr. 391). The test was normal (Tr. 391).

---

[23]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

[24]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

On June 4, 2009, plaintiff, then age 57, went to Truman Medical Center with left shoulder pain (Tr. 389). He could not straighten his elbow fully and winced in pain on manipulating the arm and shoulder. (Tr. 389). An x-ray of the left shoulder revealed chronic distal clavicular fracture with secondary AC joint arthrosis and mild degenerate joint disease of the glenohumeral joint (Tr. 384).

On June 23, 2009, plaintiff went to Swope Parkway Health Center for a follow-up on his hypertension, diabetes, and Hepatitis C (Tr. 430). Plaintiff had run out of medication for his hypertension (clonidine) two weeks earlier, and was at risk for serious complications (Tr. 430). Plaintiff's diabetes was also considered not controlled (Tr. 430). The notes reflect that the doctor explained to plaintiff he could suffer a stroke, heart attack, or death from his failure to take his medication (Tr. 430). The doctor also observed that plaintiff had refills on medication for his last visit (Tr. 430).

On August 3, 2009, plaintiff went to Dr. True at Swope Parkway Health Center (Tr. 427). Plaintiff complained about Thompson Care because his medications were always missing, coming up short, or not there (Tr. 427). Plaintiff reported that he felt mistreated and disrespected at Thompson Care Center (Tr. 427). Plaintiff appeared sad and overall stressed by his living situation, but not excessively anxious (Tr. 427). Plaintiff was diagnosed with a Major Depressive Disorder, recurrent, severe and an Anxiety Disorder (Tr. 427). Plaintiff was assigned a GAF score of 45[25] (Tr. 427).

On August 12, 2009, plaintiff went to Swope Parkway Health Center with his caseworker, who remained outside the examination room (Tr. 429). Plaintiff could not recall his medications and had not brought them with him (Tr. 429). Plaintiff was in need of a

---

[25]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

referral to a GI clinic for treatment of his Hepatitis C (Tr. 429). In addition, plaintiff needed a spirometry test[26] to evaluate his asthma (Tr. 429). Plaintiff reported left leg pain and, although his strength and reflexes were normal, he could not do heel-to-toe walking (Tr. 429). Plaintiff's medications were continued for GERD (gastroesophageal reflux disease), diabetes, hypertension, and asthma (Tr. 429).The notes reflect that plaintiff was non-compliant with his diet and that his diabetes was uncontrolled (Tr. 429). The physician stated that plaintiff needed to bring his medication to their next appointment in a month (Tr. 429).

On August 20, 2009, plaintiff presented with his caseworker to Swope Parkway Health Center (Tr. 428). Plaintiff reported that his doctor at Thompson Care Center was not correctly dispensing his medications and was holding back medication on the weekends, but he was uncertain of the doctor's name (Tr. 428). Plaintiff's diabetes was noted to be uncontrolled (Tr. 428). The caseworker asked plaintiff for a release so she could get access to his medical records at Thompson Care (Tr. 428).

On September 3, 2009, plaintiff went to the endocrinology clinic at Truman Medical Center for review of his diabetes management (Tr. 447-53). Plaintiff had a five-year history of diabetes and was currently using Lantus, Humalog and Metformin[27] (Tr. 447). Plaintiff was non-compliant with his diet and ate snacks between meals and at bedtime (Tr. 447). Plaintiff reported left lower extremity pain, imbalance, and headaches (Tr. 447). He also has occasional shortness of breath that he attributed to asthma (Tr. 447). On this visit, plaintiff showed no complications as a result of his diabetes, but needed further education regarding diet and exercise (Tr. 448). Plaintiff was unsure about his medications other than Lantus and Humalog (Tr. 447).

---

[26]A spirometer test is used to test lung function.

[27]Metformin controls insulin and is used to treat diabetes.

On September 28, 2009, plaintiff had an x-ray of his left tibia and fibula (Tr. 420). No recent bone trauma was noted (Tr. 420).

On October 15, 2009, plaintiff went to Truman Medical Center for evaluation of his Hepatitis C (Tr. 438). Before treatment could be initiated, further testing was required to determine the genotype of the infection (Tr. 439). In addition, plaintiff's depression would have to be stable prior to starting any treatment (Tr. 439).

On November 4, 2009, plaintiff went to Truman Medical Center for refills of his medications (Tr. 434-37). Plaintiff reported doing well except for his left shoulder pain (Tr. 436). Plaintiff was referred to physical therapy for treatment (Tr. 437). Plaintiff also had a followup appointment scheduled in the GI clinic for his Hepatitis C (Tr. 437). Plaintiff had yet to receive clearance from his psychiatrist to proceed with treatment (Tr. 437). Plaintiff reported smoking one-half pack of cigarettes per day and occasionally drinking alcohol, but he denied any drug abuse (Tr. 436). Plaintiff was encouraged to stop smoking (Tr. 437).

### C. ASSESSMENTS

### 1. AUGUST 25, 2008, PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On August 25, 2008, Beverly A. Moore, Medical Consultant, completed a Physical Residual Functional Capacity Assessment on plaintiff based on the medical records (Tr. 179-84). In that assessment, Dr. Moore found that plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk for about six hours; sit for about six hours; and was unlimited in his ability to push and pull (Tr. 180). Dr. Moore found that plaintiff had no postural limitations; no manipulative limitations; no visual limitations; and no environmental limitations (Tr. 181-83). Dr. Moore wrote that the medical evidence does not support significant functional limitations of plaintiff but that his activities of daily living are more significantly limited by depression and mental impairment, which could exacerbate his

experience of physical symptoms (Tr. 184). The doctor concluded, "The claimant's allegations are credible to the extent this RFC is restricted" (Tr. 184).

## 2. AUGUST 25, 2008, PSYCHIATRIC REVIEW TECHNIQUE

On August 25, 2008. Keith Allen, Ph.D., a psychologist, performed a review of plaintiff's mental conditions. Dr. Allen found plaintiff's impairments severe but not expected to last 12 months, that an RFC assessment was necessary, and that plaintiff's mental impairments were co-existing with non-mental impairments (Tr. 258). Dr. Allen diagnosed major depressive disorder (Tr. 261). He opined that plaintiff had mild restrictions of activities of daily living; moderate restrictions in maintaining social functioning; mild restrictions in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation (Tr. 266). Dr. allen concluded that "[w]ith continued treatment compliance and abstinence, [plaintiff] should be capable of performing at least less demanding tasks as physically able" (Tr. 269).

## 3. AUGUST 25, 2008, MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On August 25, 2008, Keith L. Allen, Ph.D., Psychologist, performed a mental residual functional capacity assessment of plaintiff (Tr. 270-72). Dr. Allen found that plaintiff had no significant limitation in understanding and memory; no significant limitation in concentration and persistence, except for being moderately limited in the ability to carry out detailed instructions; no significant limitation in social interaction, except for being moderately limited in the ability to interact appropriately with the general public; and no significant limitation in adaption (Tr. 271-72).

## 4. JULY 8, 2009, PSYCHOLOGICAL EXAMINATION

On July 8, 2009, Alan R. Israel, Ph.D., performed a psychological examination (Tr. 399-402). Plaintiff reported that he had been living at an assisted living facility for four months (Tr. 399). Plaintiff was placed at Thompson Care on the recommendation of his parole officer (Tr. 399).

19

Plaintiff reported dropping out of school in the eleventh grade because of anti-social behavior and repeated involvement in the juvenile justice system (Tr. 399). As an adult, plaintiff was in prison several times for robbery, burglary, theft, and fraud (Tr. 399). Plaintiff was then on probation for fraud (Tr. 399). In addition, plaintiff had participated in several drug treatment programs for cocaine and alcohol dependence (Tr. 399). Plaintiff claimed to be drug-free for about five weeks (Tr. 399-400).

Plaintiff reported that he isolates himself and does not trust other people (Tr. 400). Plaintiff also has difficulty focusing on the task at hand (Tr. 400). Plaintiff attributes his problems to his bipolar disorder and anxiety disorder, not his alcohol and drug abuse (Tr. 400). Plaintiff denied that substance abuse is a problem for him (Tr. 401).

Plaintiff reported that his last job was as a cook, which he lost in November 2008 due to problems with drugs or alcohol (Tr. 400). He lost his prior job as a cook for Embassy Suites, again because of drug and alcohol problems (Tr. 400).

In reviewing numerous medical records from Swope Parkway Clinic and Truman Medical Center, Dr. Israel noticed that plaintiff had failed to tell the assessing personnel from the Missouri Department of Mental Health, which had diagnosed him with Bipolar I Disorder, that he had used cocaine as late as January 14, 2009 (Tr. 400). The doctor also observed that reports as recent as May 5, 2009, indicate that plaintiff was interested in vocational rehabilitation (Tr. 401).

On examination, plaintiff presented with mild anxiety but no depression (Tr. 401). Plaintiff reportedly obtained his medications from Dr. True at Swope Parkway Health Center, but they were administered by the staff of the living facility (Tr. 401). Plaintiff showed no difficulty reading or writing, remembering three words for 10 minutes, or following a three-stage command (Tr. 401). Dr. Israel diagnosed plaintiff with (Axis I) cocaine abuse in early full remission in a controlled environment; alcohol abuse in early full remission in a

20

controlled environment; bipolar disorder; and (Axis II) an antisocial personality disorder (Tr. 401). Dr. Israel opined that plaintiff was capable of understanding and remembering instructions, persisting and concentrating on tasks, interacting socially in a simple work-related environment, and handling his own funds in his own best interests (Tr. 402).

### 5. *AUGUST 17, 2009, PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT*

On August 17, 2009, Dr. Tracey Snyder-Miller completed a medical consultant's report on plaintiff (Tr. 234-39). Dr. Snyder-Miller found that plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk for about six hours; sit for about six hours; and was limited in his ability to push and pull with the upper extremities in that he could do no above-the-waist lifting on the left side due to shoulder pain (Tr. 235). The only other limitation found by the doctor dealt with avoiding concentrated exposure to hazards (e.g., machinery, heights, etc.) (Tr. 237).

### 6. *AUGUST 17, 2009, PSYCHIATRIC REVIEW TECHNIQUE*

On August 17, 2009, Keith B. Allen, Ph.D., conducted a psychological review and found no restriction of activities of plaintiff's daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation (Tr. 411). The doctor opined that plaintiff could understand and remember instructions, persist and concentrate on tasks, interact socially, and adapt to a relatively simple work-related environment (Tr. 413).

### 7. *NOVEMBER 10, 2009, MENTAL IMPAIRMENT QUESTIONNAIRE*

On November 10, 2009, James True, M.D., plaintiff's treating psychiatrist, completed a mental impairment questionnaire (Tr. 414-17). Dr. True concluded that plaintiff was suffering from a Major Depressive Disorder, recurrent, severe without psychotic features (296-33) and an Anxiety Disorder, not otherwise specified (Tr. 414). Plaintiff's symptoms included sleep disturbance, mood disturbance, decreased energy, appetite disturbance, pathological

dependence, difficulty thinking or concentrating, psychomotor agitation or retardation, feelings of guilt or worthlessness, and social withdrawal or isolation (Tr. 414). Dr. True noted that plaintiff's highest GAF score both then and in the prior year was 45[28] (Tr. 414).

As a result of plaintiff's mental impairments, Dr. True opined that plaintiff would experience moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; marked deficiencies in concentration, persistence, or pace; and repeated episodes of decompensation (Tr. 415). Dr. True stated that plaintiff was unable to work because (1) plaintiff suffers from a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause plaintiff to decompensate; and (2) plaintiff has a current history of one or more years of inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement (Tr. 415). Finally, Dr. True opined that plaintiff experiences frequent deficits in attention and concentration and would likely miss more than four days of work per month (Tr. 416).

### D. SUMMARY OF TESTIMONY

During the hearing, testimony was taken from plaintiff, plaintiff's case worker, and the vocational expert.

### 1. PLAINTIFF'S TESTIMONY.

Plaintiff testified that his past work was in food service and that he last worked sometime in 2008 (Tr. 28). Plaintiff reported that he worked for a week as a mail clerk but lost that job when the employer discovered his felony background (Tr. 29). Plaintiff also performed some work as a line operator in which he supervised others packaging items on a line (Tr. 30).

---

[28]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) <u>or</u> any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

Plaintiff testified that he was then on probation and had spent time in prison in the past (Tr. 30-31).

Plaintiff testified that he lives at Thompson Care, an assisted living facility that was recommended by his parole officer (Tr. 31). Thompson Care is operated by the Department of Mental Health (Tr. 41). Plaintiff also testified that he needs "assisted living" because he has a history of drug abuse and he self-medicates with drugs or alcohol when stressed (Tr. 32). Thompson Care provides all of plaintiff's meals and cleaning services (Tr. 32). The facility is also responsible for administering all of plaintiff's medications (Tr. 32).

Plaintiff was accepted into Thompson care due to his problems with drugs (Tr. 32). Plaintiff reported that he would "self-medicate" to deal with his problems (Tr. 32).

Plaintiff testified that he has two caseworkers, Tamkia Jones and Brandon Cobb (Tr. 33). Plaintiff sees Ms. Jones approximately twice a week and she makes sure that he is getting along with others (Tr. 33). Mr. Cobb makes sure that plaintiff goes to all of his appointments, and he helps plaintiff obtain other community services (Tr. 34).

Plaintiff reported that he has difficulty with depression (Tr. 34). According to plaintiff, Dr. True has been treating plaintiff's depression for several years with different medications (Tr. 34). When plaintiff is depressed, he tends to isolate himself from others (Tr. 35). Plaintiff also has difficulty with his memory, and therefore relies on his caseworker to remind him of his appointments (Tr. 35).

Plaintiff testified that he has difficulty getting along with other people (Tr. 35-36). At his last job, there were a number of people around with whom he could not work (Tr. 36). Plaintiff represented that he tried to get moved to another area, but his boss would not approve the transfer (Tr. 36). Plaintiff testified that he has been terminated from previous employment because he did not get along with co-workers and supervisors (Tr. 36).

Plaintiff testified that he successfully completed a six-month drug and alcohol program at Imani House (Tr. 37). The program consisted of a one month inpatient stay followed by outpatient treatment (Tr. 37). Although plaintiff was not confident about the dates of when he participated, he did remember that he moved from Imani House directly to Thompson Care (Tr. 37).

At the time of the hearing, plaintiff reported that he was "going on ten months clean" (Tr. 43). He admitted that his drug addiction was the reason he is no longer living with his wife (Tr. 42).

Plaintiff testified that he has a dual diagnosis, which is why he was recommended for Thompson Care.

## 2. CASEWORKER'S TESTIMONY.

Plaintiff's caseworker, Mr. Brandon Cobb, testified that he has provided case management services to plaintiff through Swope Parkway Health Center since May 2009 (Tr. 38). The caseworker helps plaintiff with medical appointments, finding housing, and securing other community services (Tr. 38). The caseworker assists plaintiff with medication compliance, identifying medication side-effects, and maintaining therapy appointments (Tr. 39). The caseworker meets with plaintiff approximately once a week or once every other week for an hour or two (Tr. 39).

The caseworker testified that plaintiff has difficulty interacting in the community because he does not socialize well (Tr. 39). During difficult times, the caseworker has to push plaintiff to engage with others (Tr. 40).

The caseworker reported that plaintiff successfully completed a drug treatment program at Imani House in 2007 (Tr. 42).

### *3. VOCATIONAL EXPERT TESTIMONY.*

The vocational expert, Ms. Stella Doring, identified three separate types of past relevant work:

| Job Title | Skill Level | Exertional Level |
|---|---|---|
| Short order cook | semiskilled | light to medium |
| Kitchen helper | unskilled | medium |
| Production helper | unskilled | medium |

(Tr. 44.)

The ALJ asked the vocational expert to assume a hypothetical person with the following limitations:

•  Ability to perform medium work except he cannot work above the shoulder with his left, non-dominant arm and he cannot crawl;

•  Limited to the performance of simple, repetitive, unskilled work; and

•  Limited to work that does not require interaction with the general public.

(Tr. 45.)

In response to this question, the vocational expert testified that plaintiff could not perform any of his past relevant work (Tr. 45). The short order cook position would require some use or some movement of the arm above shoulder level to reach utensils (Tr. 45). The expert testified that the hypothetical person could potentially perform the job of short order cook if items were stored so that he or she did not have to reach above shoulder level or so that he or she could reach with his right arm (Tr. 45).

According to the expert, the position of kitchen helper would not be available to plaintiff because it involves more reaching and lifting (Tr. 46). The position of production helper might be able to be performed by plaintiff without the use of the left non-dominant arm above the shoulder, but not all production-helper jobs would be available (Tr. 46). The expert

testified that there would be other light and medium exertional work that the plaintiff could perform under the hypothetical propounded by the ALJ. (Tr. 46-47).

The expert testified that the hypothetical person could work in the food service industry despite testing positive for Hepatitis C (Tr. 47). On the other hand, no employment can be maintained with absenteeism higher than one day per month (Tr. 48). In addition, no employment can be maintained if the person would experience deficits in attention and concentration in excess of two and one-half hours per day (Tr. 48).

### E. FINDINGS OF THE ALJ

The ALJ wrote the following conclusions from his review of the testimony and exhibits presented at the administrative hearing:

> After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

> 1.  Claimant met the special earnings requirements of the Act on his alleged disability onset date, July 1, 2007, but he continued to meet them only through December 31, 2009.

> 2.  Claimant had not engaged in substantial gainful activity since his alleged onset date of July 1, 2007.

> 3.  The medical evidence establishes that claimant has the following "severe" impairments: a bipolar disorder; history of alcohol and cocaine abuse; mild degenerative joint disease of the left glenohumeral joint and mild left AC joint arthrosis, with history of left shoulder pain; type II diabetes mellitus; and mild degenerative disc disease of the lumbar spine. Claimant's Hepatitis C and hypertension have been considered in the combination of impairments, but are found to be not severe pursuant to the regulations. Overall, claimant does not have impairments, considered singularly or in combination, which meet or equal any criteria contained in the Listing of impairments in Appendix I, Subpart P of Regulations No. 4.

> 4.  Claimant's testimony, as well as that of his witness, with respect to the severity of claimant's overall medical condition and inability to perform all gainful work, absent substance abuse, is not credible or consistent with the totality of the evidence as discussed more fully in the evaluation section of this decision. The third party questionnaires marked as Exhibits 8E and 15E were also considered and found not controlling as to

the issue of disability for the reasons set forth in the evaluation section of this decision.

5.     Claimant, secondary to his medical impairments and absent any substance abuse, has the following residual functional capacity:  He is limited to medium work as that work is defined in the regulations, with no above-shoulder work with the left non-dominant upper extremity, and no crawling. Secondary to his mental impairments, absent substance abuse, claimant would further be limited to simple, repetitive unskilled work, with no interaction with the general public.

6.     Claimant's impairments, symptoms and resulting residual functional capacity do not prevent him from performing his past relevant work as a short order cook and production helper, and claimant has not met his burden of proving, by substantial evidence, that he is incapable of performing this work as well as other light and medium, unskilled jobs existing in significant numbers in the regional and national economies, examples of which were identified by the vocational expert at the hearing, provided he abstains from illegal substances and is medically compliant.

7.     Claimant has not been under a "disability," as defined in the Social Security Act, as amended, at any time through the date he last met the insured status requirements of the Act, or December 31, 2009.

8.     Drug addiction and alcoholism are found to be contributing factors material to the determination of claimant's disability pursuant to Public Law 104-121.

## V.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits

testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 at 1322.

### 1. PRIOR WORK RECORD

Plaintiff's work record does not support his credibility. From 1970 to 2008, plaintiff had just 14 years in which he had earnings and most of those years his earnings were de minimus.  Plaintiff has never lost or quit a job due to his impairments, but rather for drug or alcohol abuse, for failing to disclose his criminal history,  or for not getting along with others (which stems from his substance abuse).

❏   In an undated disability report, plaintiff stated that he stopped working when he went to drug rehabilitation (Tr. 128).

❏   On April 23, 2008, more than 10 months after his alleged onset date, plaintiff reported to his medical providers that he was unable to work as a cook because of his felony convictions (Tr. 349).

❏   On June 26, 2008, almost a year after his alleged onset date, plaintiff reported to his medical providers that he was looking for work but was having problems because of his prior incarceration (Tr. 345).

❑     On June 8, 2009, plaintiff was interviewed by a psychologist concerning his condition and said that he lost his last job as a cook in November 2008, and his prior job as a cook for Embassy Suites, because of his alcohol and drug problems (Tr. 400).

❑     During his December 8, 2009, administrative hearing, plaintiff testified that he lost his job as a mail clerk, after working only a week, because his employer found out about his felony background (Tr. 29).

This factor does not favor plaintiff's credibility.

## 2. DAILY ACTIVITIES

Plaintiff alleges that the combination of his mental and physical impairments make it impossible to do virtually anything. Plaintiff claims, and his care givers and wife confirm, that plaintiff spends most of his time alone sleeping.

Plaintiff's claimed inability to perform daily activities is not supported by the medical records.  His minimal daily activities appear to be by choice or due to his substance abuse rather than due to any recognized impairment.  Plaintiff was able to travel by bus to appointments, could care for her personal needs, could prepare simple meals, could do laundry and ironing, and attended 12-step meetings and went to the store for cigarettes. Plaintiff's residence at an assisted living center was due to his drug abuse and came about as a recommendation from his Parole officer due to a fear of continued drug abuse - not because plaintiff was unable to care for himself.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Although plaintiff claims that his symptoms, both physical and psychological, are severe and unrelenting, there is nothing in the medical records supporting this conclusion. For example, plaintiff's blood pressure appears well controlled when plaintiff takes his medication; plaintiff's Hepatitis does not appear to be a significant medical issue; the medical tests and examinations have not shown any organ damage; there is no evidence in the record

concerning plaintiff's neck and shoulder problems showing significant orthopedic problems; and although plaintiff's diabetes is largely uncontrolled and results in hospitalizations, it is because he is non-compliant with his medications.

This factor does not add to plaintiff's credibility.

### 4.  PRECIPITATING AND AGGRAVATING FACTORS

There are no precipitating or aggravating facts mentioned in the record.

### 5.  DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

The plaintiff's medications are effective when he decides to take them. The record is replete with entries reporting plaintiff's failure to take his medications as directed:

❏  On December 27, 2006, plaintiff went to Truman Medical Center and was unable to name his then-current medications (Tr. 311).

❏  On December 28, 2006, plaintiff went to Truman Medical Center and reported that he had been out of medications for two weeks (Tr. 380-81).

❏  On February 2, 2007, plaintiff went to Swope Parkway Health Center and had to be started again on his diabetes medication and was told to follow his diabetic diet and exercise regimen (Tr. 379).

❏  On September 19, 2007, plaintiff went to Swope Parkway Health Center and had been out of his medication for two to three months (Tr. 375).

❏  On September 24, 2007, plaintiff went to Swope Parkway Health Center and complained that he was unable to check his blood sugar because he did not have the necessary equipment (Tr. 370). Plaintiff was cautioned about his poor diet and lack of exercise (Tr. 370).

❏  On February 15, 2008, plaintiff went to Swope Parkway Health Center and was told to stop smoking, stop drug use, and increase his exercise (Tr. 366). Plaintiff was also told to stop consuming sweets and to implement a diet to deal with his hypertension (Tr. 366).

❑   On September 29, 2008, plaintiff reported to Dr. True that he could no longer obtain his blood pressure medication because Outreach was not longer paying for it (Tr. 339). However, the record establishes that plaintiff continued to use illegal substances, suggesting that he chose to use his money for illegal drugs rather than to purchase medication that could keep his impairments under control.

❑   On January 15, 2009, plaintiff was an inpatient at Truman Medical Center arriving with a blood sugar level of 538 (Tr. 273-93). Plaintiff reported two to three months of chest pain after using a large amount of cocaine and alcohol, and using cocaine the day before his admission to the hospital (Tr. 275). Once his medications were administered, plaintiff's blood sugar dropped from the 500s to the 200s (Tr. 273). By the time he was discharged, plaintiff's blood sugar was in better control (Tr. 273).

❑   On February 6, 2009, plaintiff went to Swope Parkway Health Center and his doctor found his blood sugar levels were in the 300 range (Tr. 333). The doctor directed plaintiff to additional education on controlling his blood sugar (Tr. 333).

❑   On May 6, 2009, plaintiff went to Truman Medical Center with a long list of medication but was unsure what he was taking and what he was not taking (Tr. 393).

❑   On June 23, 2009, plaintiff went to Swope Parkway Health Center for a follow-up visit on his medical conditions and reported that he had run out of his hypertension medication two weeks earlier (Tr. 430). The notes reflect that the doctor advised plaintiff about the complications from his failing to take this medication: stroke, heart attack, and death (Tr. 430).

❑   On August 3, 2009, plaintiff told Dr. True that Thompson Care, where he was residing, was losing his medications (Tr. 427).

❑   On August 12, 2009, plaintiff went to Swope Parkway Health Center for an examination and could not recall his medications and had not brought them with him (Tr.

429). The notes show plaintiff as non-compliant with his diet, and his diabetes was not controlled (Tr. 429).

❏   On August 20, 2009, plaintiff went to Swope Parkway Health Center and complained that his doctor at Thompson Care Center was not correctly dispensing his medication, but he was uncertain as to the doctor's name (Tr. 428).  Plaintiff's diabetes was uncontrolled (Tr. 428).

❏   On September 3, 2009, plaintiff went to Truman Medical Center for diabetes management (Tr. 447-53). Plaintiff was non-compliant with his diet and was eating snacks between meals and at bedtime (Tr. 447). The notes show that plaintiff was recommended for more instruction on diet and exercise (Tr. 448).

When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997).  Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

### 6. FUNCTIONAL RESTRICTIONS

Concerning plaintiff's alleged functional restrictions, my review of the record has failed to uncover any support for the conclusion that his physical problems, absent his shoulder condition for which the ALJ made an accommodation, prevents plaintiff from working. His psychological conditions, however, are a different matter.

Plaintiff alleges that his depression and anxiety interfere with his sleeping, his ability to interact with others, and his memory. Plaintiff's treating physician, James True, M.D., provided support for these difficulties when he opined, in an August 17, 2009, psychiatric review technique, that plaintiff has marked deficiencies in concentration, persistence, or pace, and that plaintiff experiences repeated episodes of decompensation (Tr. 415). Dr. True concluded that plaintiff is unable to work because he would decompensate and would continue to need a

highly supportive living arrangement to function (Tr. 415). Dr. True predicted that, if working, plaintiff would likely miss more than four days of work per month (Tr. 416).

There is little in the medical records to lend support to these conclusions, as defendant points out. For example, on September 26, 2007, plaintiff was evaluated by the Department of Mental Health, during which he reported one previous psychiatric hospitalization and one inpatient stay at a drug rehabilitation facility (Tr. 247). Plaintiff was diagnosed with depression, given medication, and found eligible for residential addiction services (Tr. 247). Otherwise, most of the entries deal with adjusting plaintiff's medications and assigning GAF scores.

The potential impact of plaintiff's psychiatric problems is further complicated by his dual diagnosis of depression and alcohol and other drug abuse. The ALJ, in considering the evidence, found that plaintiff met Listing 12.09, substance abuse, which required the exclusion of limitations related to substance abuse, and concluded that plaintiff could perform a reduced range of work at the medium level of exertion.

There are record entries documenting plaintiff's continued use of alcohol and cocaine throughout the period of his alleged disability:

❏ On September 24, 2007, plaintiff conceded, during a visit to Swope Parkway Health Center, that he had used cocaine in May 2007 (Tr. 370).

❏ In November 2008, as recalled in a later interview with psychologist Alan R. Israel, plaintiff lost his last job as a cook for alcohol and drug problems (Tr. 400).

❏ On January 15, 2009, plaintiff admitted to medical providers that he used cocaine the day before this hospitalization (for chest pain and hyperglycemia), and he disclosed to the treating medical personnel that he had been using cocaine and alcohol in large amounts for two to three months (or starting sometime around October 2008 and continuing to January 14, 2009) (Tr. 275).

❑ On July 8, 2009, plaintiff was interviewed by psychologist Alan R. Israel and claimed to be drug free for five weeks (or since sometime around May 2009 to July 8, 2009), which is a clear admission to drug use during the time plaintiff has alleged he was disabled and completely unable to work (Tr. 399-400).

Based on these entries, I do not believe the ALJ improperly determined plaintiff's functional restrictions.

## B. CREDIBILITY CONCLUSION

In addition to the above, there are other concerns about plaintiff's credibility. For example, after reviewing plaintiff's medical records, Dr. Israel observed that plaintiff had neglected to tell the assessing officials from Missouri's Department of Mental Health, during his May 5, 2009, evaluation for treatment at Imani House, that he had used cocaine as late as January 14, 2009; instead he had told them he had not used illegal drugs since being released from prison (Tr. 400).

Plaintiff tried on several occasions to represent, unconvincingly, to his medical providers that his failure to take his medications and otherwise be compliant was the fault of others and not his fault. On September 24, 2007, plaintiff complained that he did not have the necessary equipment to test his blood-sugar levels because some program refused to pay for it. On September 28, 2008, plaintiff complained that he could not obtain his blood pressure medication because Outreach was no longer paying for it (Tr. 339). On August 3, 2009, plaintiff complained that Thompson Care Center was missing or coming up short with his medications (Tr. 427). On August 20, 2009, plaintiff alleged that his doctor ast Thompson Care Center was not correctly distributing his medications, particularly on weekends (Tr. 428). These allegations are implausible when considered in the light of plaintiff's extensive record of failing to follow his doctors' instructions with regard to taking his medication, watching his

diet, and exercising, and in light of the fact that plaintiff continued to obtain and consume illegal drugs during this time.

There are other instances that call into question plaintiff's credibility. Although not particularly material to the issues, plaintiff has given several versions of his smoking history - on May 3, 2007, plaintiff reported that he had been smoking for 40 years (Tr. 395-97) but on May 6, 2009, he said he had been smoking for 20 years (Tr. 393). Whichever the case, he was told to stop smoking but, again, failed to follow the directives of his medical providers. On May 6, 2009, at Truman Medical Center, plaintiff denied ever using alcohol (Tr. 393) when the day before he had reported to the Department of Mental Health that he had a history of substance abuse including cocaine, heroin, and alcohol (Tr. 319). The fact that a plaintiff has one or more felony convictions, particularly a conviction for fraud, is a matter that may be considered in evaluating his or her credibility. Simmons v. Massanari, 264 F.3d 751, 756 (8th Cir. 2001); Hemphill v. Astrue, 2011 WL 2295025, *7 (D.Kan. 2011); Hill v. Astrue, 2011 WL 711100, *6 (D. Or. 2011); Weirich v. Astrue, 2010 WL 4736481, *5 (C.D. Cal. 2010). Here, plaintiff was in prison several times for robbery, burglary, theft, and fraud (Tr. 399). Plaintiff was on probation for fraud at the time of his alleged disability (Tr. 399). Finally, plaintiff's treatment was for the most part conservative. Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative medical treatment. Loving v. Dept. of Health & Human Services, 16 F.3d 967, 970 (8th Cir. 1994).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's credibility finding.

## VI. TREATING PSYCHIATRIST'S OPINION

Next, plaintiff complains that the ALJ failed to give controlling weight to the treating psychiatrist's opinion in the Medical Impairment Questionnaire that plaintiff was unable to work (Tr. 414-17).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Here, there is no question that James True, M.D., is a specialist in the field of psychiatry; that Dr. True established a treating relationship with plaintiff that spanned the years between 2007 and 2009; and that Dr. True had regular contact with plaintiff about his mental health issues during that period of time. However, the ALJ gave "little weight" to Dr. True's opinion because it was not supported by medically accepted clinical and laboratory diagnostic techniques and was not consistent with other substantial evidence in the record:

> The undersigned notes that since being abstinent from illegal substances, while at Thompson Care Center, claimant's mental symptoms have not been reported to be significant. Specifically, the May 21, 2009 treatment record from Swope Behavioral Health showed minimal mental findings. Other medical evidence that belies claimant's allegations of debilitating mental symptoms, absent substance abuse, is the July 28, 2009 consultative psychological evaluation hy Dr. Alan Israel. It was noted then that claimant was presently living in the Thompson Care Program and had been for about four months, having been placed there by the Missouri Department of Probation and Parole. Dr. Israel's report also showed that claimant had been in numerous drug treatment programs and was, at that time, an outpatient at the Imani House. Claimant's drugs of choice were noted to be cocaine and alcohol. Overall, Dr. Israel noted that claimant had been clean from cocaine for about five weeks. Claimant reportedly had been at Imani House in 2007, 2008 and again in 2009. Overall, Dr. Israel indicated that although the medical record from January 16, 2009 indicated that claimant had last used cocaine on January 14, 1009 *[sic]*, he apparently did not tell that to the people who were doing the assessment on May 5, 2009, and mental health sources at that time indicated that claimant had not used cocaine since he had been in prison.

Dr. Israel's mental diagnoses for claimant consisted of a bipolar disorder, not otherwise specified, cocaine abuse, in reported early full remission in a controlled environment. and alcohol abuse, in reported early full remission in a controlled environment, as well as an anti-social personality disorder. Overall, Dr. Israel opined that claimant was capable of understanding and remembering instructions, persistence and concentration on tasks, interacting socially, and would be able to adapt to a relatively simple work-related environment. Claimant was also noted to be capable of handling funds in his own best interest.

The undersigned, overall, finds that claimant's mental condition, absent substance abuse, would not be disabling so as to prevent him from performing all types of competitive employment, on a sustained, full-time basis. It is clear from the record that claimant has a long history of substance abuse (alcohol and cocaine) and incarcerations and is currently on probation. Moreover, claimant is in a residential care facility because of his probation and substance abuse problems, having been placed there by the Missouri Department of Probation and Parole. He has been in detoxification programs on multiple occasions and has repeatedly relapsed on cocaine following treatment. Accordingly, the undersigned finds that drug addiction and alcoholism are contributing factors material to the determination of claimant's disability. The undersigned finds that with substance abuse, claimant's mental condition would meet the severity of criteria of Mental Listing 12.09, relating to substance addiction disorders, for the period up until at least June 2009. However, absent any substance abuse, claimant would have no significant mental health findings that would prevent him from performing all types of competitive employment.

In arriving at the above conclusion, the undersigned has considered all of the medical evidence, including the updated medical reports submitted by counsel after the hearing, as well as all medical opinions, including the Mental Impairment Questionnaire form completed by Dr. James True on November 10, 2009. Dr. True, at that time, assessed some very significant mental limitations for claimant, particularly with respect to deficiencies of concentration and repeated episodes of deterioration, all of which would preclude competitive employment.

An Administrative ve Law Judge must weigh the credibility of respective physicians. Additionally, although the uncontradicted opinion of a treating physician is entitled to substantial weight, that tenet is not without some limitations. In weighing opinion evidence, the degree to which the opinion is supported by medical signs and findings is also considered (20 CFR § 404.1527(d)(3)). The undersigned, overall, finds that the opinion, findings and assessment of Dr . True are not consistent with the totality of the medical evidence, provided claimant remains substance free. The undersigned further notes that Dr. True's previously-cited findings render an opinion on the ultimate issue of disability and inability to engage in gainful activity under the Social Security Act, all of which is reserved to the Commissioner. Accordingly, the above opinion and assessment of Dr. True is being accorded little weight.

(Tr. at 15-16).

The substantial evidence in the record as a whole supports the ALJ's decision. The record reflects that plaintiff almost always attributed his inability to work to either his prior criminal record or his substance abuse, or both, but not to his mental or physical impairments. Furthermore, plaintiff often misrepresented his status to his medical providers on important issues such as compliance with his medication regimen and his use of alcohol and other drugs; therefore, one can easily see how a treating psychiatrist could be mislead by such a patient and believe his limitations are caused more by mental illness rather than drug abuse and/or medication non-compliance.

In addition, the ALJ had at his disposal significant input from the consulting psychologist, Keith B. Allen, Ph.D., who found no restrictions on daily activities; mild restrictions in social functioning; mild difficulties in concentration, persistence, and pace; and no repeated episodes of decompensation. Although Dr. Allen did not examine plaintiff, the ALJ was entitled to rely upon his opinions because they were based on the medical evidence in the record and also took into account plaintiff's misrepresentations regarding his drug abuse.

Therefore, I find that the ALJ did not err in substantially discrediting Dr. True's opinion in his Medical Impairment Questionnaire.

### VII.  PLAINTIFF'S ABUSE OF ALCOHOL AND OTHER DRUGS

Finally, plaintiff argues that the ALJ erred in finding that plaintiff's drug addiction and alcohol use were contributing factors material to the determination of disability .

Plaintiff bears the burden of proving that substance abuse was not a contributing factor material to the alleged disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002), citing Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000).

Alcoholism and drug addiction are no longer a basis for obtaining Social Security benefits. Pub. L. No. 104-121, 110 Stat. 852-56 (1996). "An individual shall not be considered disabled for purposes of this title if alcoholism or drug addiction would (but for this

38

subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. 423(d)(2)(C), 42 U.S.C. 1382c(a)(3)(J). The claimant has the burden of proving that alcoholism or drug addiction is not a contributing factor. Kluesner v. Astrue, 607 F.3d 533, 537 (8th Cir. 2010); Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise acknowledged disability, the claimant's burden has been met and an award of benefits must follow." Kluesner v . Astrue, 607 at 537 quoting Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). That is, in the matter of a tie, the claimant wins. Id.

In the case of alcoholism and drug addiction, an ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability. Kluesner v. Astrue, 607 F.3d at 537; Brueggemann v. Barnhart, 348 F.3d at 694; 20 C.F.R. §§ 404.1535(a) and 416.935. If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of the substance abuse. Kluesner v. Astrue, 607 F.3d at 537; Brueggemann v. Barnhart, 348 F.3d at 694-95.

In this case, the ALJ found that plaintiff's substance abuse met Listing 12.09, a finding that triggered the provisions of 20 C.F.R. § 404.1535 requiring the ALJ to exclude from plaintiff's functional limitations those restrictions reasonably related to his substance abuse.

As discussed above in the subsection dealing with plaintiff's daily activities under Polaski, plaintiff repeatedly admitted that the reasons for his unemployment, or losing jobs after employment, were (1) his alcohol and drug abuse and (2) his prior criminal record. Additionally, plaintiff was placed in Thompson Care because of his problems with drugs. He consistently lied to his treatment providers about his drug use and he continued to use illegal drugs while claiming he could not afford his prescribed medication. Therefore I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's functional

restrictions - not considering those caused by his substance abuse - do not preclude substantial gainful activity.

## VIII. OTHER ARGUMENTS

Plaintiff raises two additional challenges to the ALJ's decision that I will deal with in summary fashion: (1) the ALJ's reliance on a hypothetical question posed to the vocational expert, which plaintiff alleges failed to capture all of his impairments; and (2) the ALJ's conclusion that plaintiff could perform work requiring medium exertion.

I have looked at both issues and find that neither has merit. A hypothetical question posed to a vocational expert must include all credible impairments and limitations. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). A hypothetical relied on by the ALJ need not include impairments the ALJ has found not credible. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004). As discussed above, the limitations plaintiff believes should have been included in the hypothetical were properly found not credible by the ALJ.

As far as plaintiff's residual functional capacity, he argues that he cannot lift 25 pounds frequently and 50 pounds occasionally and therefore is incapable of performing medium work. However, the ALJ properly assessed plaintiff's credibility and determined, from the substantial evidence in the record as a whole, that plaintiff retained the residual functional capacity to perform medium work. I find no error.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole support's the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 22, 2011